[L.A. No. 31422. May 10, 1982.]

CITY OF LOS ANGELES, Plaintiff, Cross-defendant and Respondent, v.
VENICE PENINSULA PROPERTIES et al., Defendants, Cross-defendants and Appellants;
THE STATE OF CALIFORNIA ex rel. STATE LANDS COMMISSION, Defendant, Cross-complainant and Respondent.

**COUNSEL**

Hill, Farrer & Burrill, John N. McLaurin, William M. Bitting, Steven W. Bacon, William A. Dorland and Maxine F. Thomas for Defendants, Cross-defendants and Appellants.

Edgar B. Washburn and Washburn, Kemp & Wagensell as Amici Curiae on behalf of Defendants, Cross-defendants and Appellants.

Burt Pines and Ira Reiner, City Attorneys, and Norman L. Roberts, Assistant City Attorney, for Plaintiff, Cross-defendant and Respondent.

George Deukmejian, Attorney General, N. Gregory Taylor, Assistant Attorney General, and Nancy Alvarado Saggese, Deputy Attorney General, for Defendant, Cross-complainant and Respondent.

Frederic P. Sutherland, Hal J. Bohner, Sanford M. Skaggs, Palmer Brown Madden, Maria P. Rivera and Van Voorhis & Skaggs as Amici Curiae on behalf of Plaintiff, Cross-defendant and Respondent and Defendant, Cross-complainant and Respondent.

## OPINION

**MOSK, J.—** ■  In a series of recent cases, this court has considered the scope and effect of the public trust doctrine. Under that doctrine, the state holds a trust interest on behalf of the public in tidelands (*City of Berkeley v. Superior Court* (1980) 26 Cal.3d 515 [162 Cal.Rptr. 327, 606 P.2d 362]) and in lands between high and low water in nontidal navigable lakes (*State of California v. Superior Court (Lyon)* (1981) 29 Cal.3d 210 [172 Cal.Rptr. 696, 625 P.2d 239]; *State of California v. Superior Court (Fogerty)* (1981) 29 Cal.3d 240 [172 Cal.Rptr. 713, 625 P.2d 256]). The public may use such properties for purposes such as commerce, navigation, and fishing, as well as for environmental and recreational purposes. These lands may be conveyed to private persons only to promote trust uses, and grants not made for that purpose remain subject to the rights of the public. (For a scholarly analysis of the development of the public trust in the United States and in California, see Stevens, *The Public Trust* (1980) 14 U.C. Davis L.Rev. 195, 199 et seq.)

The foregoing cases involved property which was originally owned in fee by the state or federal government and granted by them to private persons. In the present case, the issue is whether the public trust doctrine applies to tidelands in which the state and federal government never had fee title. The tidelands involved here were originally acquired by private persons from the Mexican government prior to the time California was ceded to the United States under the Treaty of Guadalupe Hidalgo, and later patented to the owners by the federal government in accordance with the requirements of the treaty.

Ballona Lagoon, the subject of this proceeding, is an arm of the Pacific Ocean in the Marina del Rey area of Los Angeles. It is subject to

the tides, and inundated with seawater at mean low tide and mean high tide. At mean high tide, the depth of the water is sufficient to be navigable by shallow draft vehicles. At its northern end, the lagoon is connected to the Venice Canals, and provides the sole source of water for them.

In 1905, the shore surrounding the lagoon was subdivided into three large abutting tracts, and some of the tidelands were filled and improved. The present case involves two of those tracts, lot R of the Silver Strand subdivision and a portion of lot C of the Del Rey subdivision, both of which consist entirely of waterways. Access to the lagoon is now provided by walkways surrounding the shore, public streets to the shoreline, and bridges across the lagoon. In recent years, motor-controlled tide gates were installed between the Pacific Ocean and the entrance to the lagoon to control the ebb and flow of the tide within the lagoon; they are used to prevent flooding of the adjacent land.

The City of Los Angeles desired to dredge the lagoon, construct sea walls, and make other improvements therein without exercising its power of eminent domain. It filed an action for declaratory relief and to quiet title in the lagoon against the owners of lots C and R, and the holder of an easement in these lots (hereinafter called defendants).[1] The complaint alleged that the public owns an easement in the lagoon for commerce, navigation and fishing, for the passage of fresh water to the Venice Canals, and for water recreation. It alleged also that the lots had been dedicated by their owners for public use. The city joined the State of California as a defendant in the action, as contemplated by

---

[1] Some of the defendants originally named in the action sold their interests in the lots to the present owners. Summa Corporation is the owner of the portion of lot C involved in this case; Venice Peninsula Properties and other defendants own lot R.

Southern California Gas Company, sued as a fictitious defendant, owns an easement for a pipeline which traverses the lagoon, and maintains an underground storage area on lot C which may extend beneath the waters of the lagoon. Its interest in this proceeding appears somewhat attenuated. The company sought a declaration that plaintiffs would be required to pay it compensation if relocation of the pipeline is required by the improvements which the city proposed to construct. However, there is no indication that these improvements will affect the company's easements; plaintiffs' briefs imply to the contrary. In any event, plaintiffs concede, as they must, that they will be required to compensate the company in the event any improvements they may make at some future time damage the company's facilities. (Pub. Resources Code, § 6312.)

Although the trial court found that the public's right is "paramount" to the rights of the gas company, we do not understand this finding to mean that, contrary to section 6312, the improvements constructed by the gas company may be taken without payment of compensation.

section 6308 of the Public Resources Code.[2] The state thereafter filed a cross-complaint, alleging that it had acquired an interest in the tidelands of the lagoon for commerce, navigation and fishing upon admission to the Union, that it held this interest in trust on behalf of the public, and had granted its interest to the city. (For literary convenience, the city and the state will be referred to collectively as plaintiffs.)

After a trial at which both documentary and testimonial evidence was received, the trial court determined that the state holds in trust for the people the easements claimed in the city's complaint, and that the state or its successors have the right to construct the improvements in the lagoon without exercising the power of eminent domain.[3] The court found also that defendants had dedicated the property as public streets or waterways.

■ Before discussing the primary issue of whether the tidelands trust applies to lands granted by Mexico and later patented to the owners by the federal government, we must consider defendants' claim that the trust doctrine does not apply to their property. They assert that the United States government determined as a fact in the course of the proceedings which culminated in the issuance of a patent to their predecessors in interest that the property in question was not tidelands, and this determination, right or wrong, cannot now be challenged by plaintiffs.

In order to decide this issue, we must examine the circumstances of the original grant and the subsequent patenting process.

---

[2]Section 6308 provides: "Whenever an action or proceeding is commenced by or against a county, city, or other political subdivision or agency of the State involving the title to or the boundaries of tidelands or submerged lands that have been or may hereafter be granted to it in trust by the Legislature, the State of California shall be joined as a necessary party defendant in such action or proceeding...."

[3]In 1917, the state granted to the City of Venice any right which it had in tidelands within the boundaries of the city, in trust. The granting statute stated, "nothing contained herein shall in any way affect any property held or claimed under, through or from a Mexican grant or patent therefor within the present boundaries and jurisdiction of said city ...." (Stats. 1917, ch. 77, p. 89.) The City of Los Angeles succeeded to the rights of Venice in these tidelands under a grant which excepted "any property held under, through or from a Mexican grant or patent ...." (Stats. 1945, ch. 1513, p. 2826.) There is no indication as to why these exceptions were made. The critical question in this proceeding is whether the public has retained an interest in the property in question. Whether that interest is held by the city, or by the state (as the trial court concluded), has no significant effect on the public's rights in the property if such rights exist.

In 1839, while California was a part of Mexico, the Constitutional Governor of California granted to Augustin and Ignacio Machado and Filipe and Tomas Talamantes a property known as Rancho Ballona. The rancho's western border was the Pacific Ocean, and it included lots C and R. After the war with Mexico was concluded by the Treaty of Guadalupe Hidalgo, California was ceded to the United States. Under the terms of the treaty, the rights of Mexican citizens to their property were to be "inviolably respected." (Treaty of Guadalupe Hidalgo, Feb. 2, 1848, Art. VIII, 3 West's Cal. Const. (1954) 727, 732.)

In keeping with this obligation, in 1851 the federal government passed "An Act to ascertain and settle the private Land Claims in the State of California" (hereinafter referred to as the Act of 1851), the purpose being to establish a method by which the claims to land granted by Mexico could be confirmed and settled in the grantees by the federal government. (9 Stat. 631.)

The Machados and Talamantes, following the procedure set forth in the act, petitioned the Board of Land Commissioners in 1852 for a decree confirming their title to the rancho. After a hearing, the board confirmed the title, describing the boundaries of the rancho in the same terms as the original Mexican grant. That decision was affirmed by the United States District Court in 1855.

However, before a patent could issue, a survey of the property was required, approved by the Surveyor General of California. (9 Stat. 633, § 13.) In 1858, Henry Hancock conducted a survey and prepared a plat which showed a large body of water labelled "inner bay" extending from the southwest corner of the property parallel to the Pacific Ocean in a northwesterly direction. Hancock's field notes set forth his measurements as he walked along the shores of the bay, crossed an inlet, and came to the Pacific Ocean.

For reasons which are not entirely clear from the record, the correctness of the survey was not determined until 17 years later. In 1869, objections to the survey were filed by owners of the ranch which bordered Rancho Ballona on the north, an area some distance from that marked "inner bay" on the Hancock survey. Under a statute passed in 1864 to expedite the settlement of land titles in California (13 Stat. 332), the Hancock survey was forwarded to Washington to the General Land Office Commissioner, who was required to approve it prior to the issuance of the patent, and to settle conflicting claims to the lands sur-

veyed. Commissioner Willis Drummond decided that the survey was accurate with regard to the disputed northern boundary. He determined also that the "inner bay" shown on Hancock's map was not an arm of the sea, basing this determination in part on three affidavits which stated that the area labelled "inner bay" on the plat was dry land used for pasturage, except at times of overflow at high water and during storms, when sand blocked the mouth of a creek which, on Hancock's plat, emptied into the "inner bay." However, Drummond approved the Hancock survey.

Thereafter, a patent was issued. It not only incorporated the plat prepared by Hancock, but his field notes as well. The grant was for "the tract of land embraced and described in the ... Survey...." Defendants base their claim that the patent proceedings determined conclusively that the "inner bay" was not tidelands, upon the finding of Drummond.

The parties are in disagreement as to what was finally decided in the patent proceeding[4] and whether the determination as to the character of the "inner bay" was necessary to the approval of the survey.[5] For the purpose of analyzing the effect of the patent we assume, without deciding, that defendants prevail on these matters and that Drummond's determination that the "inner bay" was not an arm of the sea was a final decision on that question and a necessary predicate to the issuance of the patent.

But these assumptions do not end the matter. The four corners of the patent, when considered in light of Drummond's finding, present an obvious ambiguity. The plat attached to the patent shows an "inner bay," and Hancock's field notes, repeated therein, describe his measurements around this bay. The principal definition of a "bay" is "an inlet of the

---

[4] The owners of the ranch north of the Rancho Ballona appealed Drummond's decision to the Secretary of the Interior; in affirming, the secretary referred specifically only to the boundary line dispute. From this circumstance, plaintiffs urge that Drummond's decision is not binding because it was an intermediate decision affirmed by higher authority only to the extent that it decided the boundary dispute.

[5] Plaintiffs claim that the question whether the "inner bay" shown on Hancock's map was an arm of the sea was not necessary to Drummond's decision because only the placement of the northern boundary was challenged; even if all the boundaries of the ranch were in issue, they argue, the question whether the "inner bay" was land or water was irrelevant to those boundaries. Defendants contend, on the other hand, that the area described as the "inner bay" would have been excluded from the grant if it had consisted of tidelands.

sea, usually smaller than a gulf, but of the same general character. . . . ” (Webster's New Internat. Dict. (2d ed. 1951) p. 234.) Drummond had the power to investigate the correctness of the survey or to order that a new one be made (13 Stat. 332, 333). Instead, he approved it without requiring any changes even though it was inconsistent with his determination regarding the character of the "inner bay."

In view of this inconsistency between the terms of the patent and the opinion of Drummond, the trial court was justified in admitting evidence as to whether the area in question was an arm of the sea and tidelands at the time California was admitted to the Union in 1850. The court found as a fact that for more than 900 years the lagoon has been an arm of the sea, subject to the tides. This conclusion is supported by overwhelming evidence, and defendants do not seriously challenge its validity.[6]

■ We come, then, to the primary issue before us, i.e., whether defendants' property is subject to the public trust. Under the Act of 1851, all land in California, including tidelands, which had belonged to Mexico and was not patented to private parties, became the property of the United States. (9 Stat. 631, § 13, p. 633.) The federal government held the interest in tidelands in trust for the future state, and when California was admitted to the Union, it succeeded to the rights of the United States as an incident of sovereignty. (*City of Berkeley* v. *Superior Court, supra*, 26 Cal.3d 515, 521.)

Defendants urge that the tidelands trust is an incident of title, that the federal government never acquired title to tidelands granted by Mexico to private parties and confirmed by patents issued by the United States, and that it follows, therefore, that the state, upon admission to the Union in 1850, could not succeed to an interest which the federal government never possessed.[7] Plaintiffs concede that defendants have title to the tidelands, but they assert that the federal government

---

[6]Experts in the field of geology and geomorphology testified that the Ballona Lagoon is the remnant of a larger, wider, and deeper tidal body of water which existed in 1839 and for more than 900 years prior thereto. Their conclusions were based in part on surveys of the area by the federal government in 1876, 1887, and 1896, which showed the lagoon as an arm of the sea in a configuration consistent with the map drawn by Hancock, and scientific tests of the subsurface of the lagoon.

[7]California did not acquire *title* as an incident of sovereignty to tidelands which were patented under the Act of 1851. (E.g., *United States* v. *Coronado Beach Co.* (1921) 255 U.S. 472, 488 [65 L.Ed. 736, 742, 41 S.Ct. 378]; *People* v. *San Francisco* (1888) 75 Cal. 388, 398 [17 P. 522].)

acquired an interest in trust in such lands on behalf of the public when California was ceded by Mexico, that this interest did not pass with the patent issued to defendants' predecessors, and that the state acquired it as an incident of sovereignty in 1850.

In analyzing these conflicting claims, we must decide, first, whether the title which defendants' predecessors received from Mexico was subject to the rights of the public in the tidelands encompassed in the grant and, second, if so, whether the United States acquired these rights upon annexation of California.

The law of Mexico at the time of cession declared that the public had a right to the use of the tidelands; this right was similar to the common law public trust.[8] In the grant of the Rancho Ballona to the Machados and Talamantes, it was provided that the grantees "may enclose it without prejudice to the traversing roads and servitudes." An expert on the law of Mexico who testified on behalf of defendants stated that the purpose of this language was to preserve "the rights of the public . . . in the conveyance of large tracts of land by the authorities."[9] Thus, when California was ceded by Mexico, the title of defendants' predecessors was subject to the interests of the public in the tidelands included in the grant.

Next, we consider whether the United States acquired that interest upon annexation of California. There is little authority regarding this issue. As we have seen under section 13 of the Act of 1851, lands which

---

[8]Law III of Title XXVIII of Las Siete Partidas, the law in effect while California was a part of Mexico, provided, "The things which belong in common to the creatures of this world are the following, namely, the . . . sea and its shores, for every living creature can use each of these things according as it has need of them. For this reason every man can use the sea and its shore for fishing or for navigation, and for doing everything there which he thinks may be to his advantage." Law VI provided, "Rivers, harbors, and public highways belong to all persons in common. . . ." (Las Siete Partidas, CCH (Spain) (1931) pp. 820-821.) The Mexican law originated in 13th century Spain under Alfonso the Wise. (Stevens, *The Public Trust, supra,* 14 U.C. Davis L.Rev. at p. 197.)

[9]Indeed, according to the expert witness, Mexican law prohibited the alienation of tidelands. While we are not aware of any authority on the question whether a conveyance of tidelands by Mexico (perhaps erroneously) preserved the public's right in the land, the concept of retention by the public of rights in lands conveyed by the government to private parties was not alien to the law of Mexico, as we shall see. In the absence of any indication to the contrary, we assume that tidelands conveyed by Mexico remained subject to the public's interest.

had belonged to Mexico and were not patented by the federal government to private parties became the property of the United States. This provision does not state whether less than fee interests retained by Mexico in land conveyed by that government, such as the public interest in tidelands, also passed to the new government.

So far as we have been able to determine, only one case has addressed that question. Under Mexican law, a grant of land by the government did not include mineral rights. In *Moore* v. *Smaw* (1861) 17 Cal. 199, the court was called upon to decide, inter alia, whether the United States became the owner of the mineral rights in California lands granted by Mexico to private parties. It held that under the provisions of the Act of 1851, the mineral rights retained by the Mexican government were "by the cession passed, with all other property of Mexico within the limits of California, to the United States." (17 Cal. at p. 217.)

The same reasoning should apply to tidelands. The interest of the Mexican government in these lands, like mineral rights, was "property of Mexico," at the time of cession and therefore became the property of the United States. In view of the public's strong interest in tidelands, the established doctrine that title in such lands in the hands of private persons is usually subject to the rights of the public, and the rule that statutes conveying tidelands should be interpreted if reasonably possible to avoid a destruction of the public use (*People* v. *California Fish Co.* (1913) 166 Cal. 576, 597 [138 P. 79]), we hold that under the Act of 1851, the federal government succeeded to Mexico's right in the tidelands granted to defendants' predecessors upon annexation of California.

We reject defendants' assertion that the tidelands trust is inevitably an incident of fee title by the government. It is true, as they claim, that prior cases have described the trust in the context of tidelands which the government owns or owned at one time.[10] However, these cases do not hold that title in the government is essential to the existence of the

---

[10]For example, in *People* v. *California Fish Co., supra,* 166 Cal. 576, 584, tidelands are referred to as belonging to the state in its sovereign character, and in *Illinois Central Railroad* v. *Illinois* (1892) 146 U.S. 387, 452 [36 L.Ed. 1018, 1042, 13 S.Ct. 110], the government's interest in tidelands is described as "a title held in trust for the people of the state...."

trust. So far as we are aware, this is the first case which has squarely presented that question.[11]

Thus far, we have decided that upon annexation of California, the federal government succeeded to the ownership of the public's rights in the tidelands contained in ranchos which had been conveyed by Mexico. The next question is whether those rights were relinquished by issuance of the patents to the Mexican grantees. The major disagreement between the parties arises over the effect of the patent on the tidelands. Defendants insist that the failure of the United States to reserve the public's right when it issued the patent to their predecessors bars plaintiffs from now asserting such rights. Plaintiffs counter—and the trial court found—that, while the questions of title and boundaries were conclusively decided upon issuance of the patent, whether the title was subject to the rights of the public was not an issue in the patent proceedings.

Although early cases of the United States Supreme Court relied upon by defendants declared that the deed granted by the United States pursuant to the Act of 1851 was a "quitclaim, or rather . . . a conveyance of such interest as the United States possessed in the land," (*Beard* v. *Federy* (1866) 70 U.S. (3 Wall.) 478, 491 [18 L.Ed. 88, 92]; *Adam* v. *Norris* (1880) 103 U.S. 591, 593 [26 L.Ed. 583, 584]), this view was later rejected by the high court. In *Boquillas Cattle Co.* v. *Curtis* (1909) 213 U.S. 339, 344 [53 L.Ed. 822, 825, 29 S.Ct. 493], it was held that a patent from the federal government was a "confirmation in a strict sense" of the interest received from Mexico. In the course of its opinion, the court observed, "It is not to be understood that when the United States executes a document on the footing of an earlier grant by a former sovereign it intends or purports to enlarge the grant." (213 U.S. at p. 344 [53 L.Ed. at p. 825].)[12]

*Moore* v. *Smaw, supra,* 17 Cal. 199, decided many years before *Boquillas,* appears at first blush to support defendants' assertion that any

---

[11]We disapprove dictum in *San Diego County Archeological Society, Inc.* v. *Compadres* (1978) 81 Cal.App.3d 923, 927 [146 Cal.Rptr. 786], to the effect that the public trust doctrine applies only to property to which the state has at one time held title.

[12]In *Boquillas,* the plaintiff, who had received a grant of land from the State of Sonora, claimed that a patent to the land issued under a law similar to the Act of 1851 carried with it a preference to take water as a riparian landowner.

rights acquired by the federal government upon cession in lands conveyed by Mexico to private parties were granted by the patent. However, when the reasons for the holding of *Moore* are analyzed, its effect is to support the position of plaintiffs.

As we have seen, *Moore* held that under the Act of 1851, the United States acquired ownership of minerals in lands which had been conveyed by Mexico to private parties because under Mexican law that government retained the ownership of the minerals. The question facing the court in *Moore* was whether the patent of the federal government, which reserved no interest in the minerals, granted that interest to the landowners. The court concluded that the grant included the mineral rights. It reasoned that California did not succeed to the interests of Mexico upon statehood since ownership of mineral rights was not an incident of sovereignty. Therefore, the federal government held that interest in the same capacity as a private landowner and, since a grant of land by an individual without reservation of mineral rights passed ownership of such rights to the grantee, the same rule should apply to conveyances of the government. The court went on to state that patents of the United States since the Revolution had uniformly been regarded as transferring all the interest which the government could possess in the soil, even when the grant was a confirmation of one made by a prior government.

Thus, although *Moore* held that the federal patent enlarged the property rights of Mexican grantees, the reason for its conclusion was that mineral rights are not an incident of sovereignty and, therefore, a patent by the United States which failed to reserve that right conveyed fee title to the grantee. The clear implication of this holding is that if sovereign rights to property had been involved the court's conclusion would have been otherwise. Tidelands are not held by the government in its proprietary capacity; they are held in trust for the benefit of the public, may not be alienated at will, and unlike lands containing mines, when tidelands are conveyed into private hands they ordinarily remain subject to the public interest even though the grant is purportedly in fee. (See, e.g., *Carver v. San Pedro, L.A. & S.L.R. Co.* (S.D.Cal. 1906) 151 F. 334, 337; *People v. California Fish Co., supra,* 166 Cal. 576, 593.) In the absence of convincing authority to the contrary, therefore, we may not presume that the patent issued to defendants' predecessors included the interest in the tidelands which the United States government had acquired from Mexico.

Defendants cite numerous cases which they claim stand for the proposition that the patents issued under the Act of 1851 passed all interests of the federal government to the grantee, and that the state did not acquire any interest in the tidelands included in Mexican grants as an incident of sovereignty upon admission to the Union. These authorities establish that a federal patent determined conclusively that the grantee had title to the land described therein, and that this interest prevailed over later claims of ownership by private parties or the government. (E.g., *Knight* v. *U.S. Land Association* (1891) 142 U.S. 161, 184 [35 L.Ed. 974, 982, 12 S.Ct. 258]; *San Francisco* v. *LeRoy* (1891) 138 U.S. 656, 670-671 [34 L.Ed. 1096, 1101, 11 S.Ct. 364]; *Beard* v. *Federy, supra*, 70 U.S. 478, 492 [18 L.Ed. 88, 92-93]; *People* v. *San Francisco, supra*, 75 Cal. 388, 398; *Teschemacher* v. *Thompson* (1861) 18 Cal. 11, 26.) Moreover, the fact that the land described in the patent included tidelands did not diminish its conclusive effect. (*United States* v. *Coronado Beach Company* (1921) 255 U.S. 472, 487-488 [65 L.Ed. 736, 741-742, 41 S.Ct. 378].)

Defendants rely heavily on the case last cited. In the *Coronado Beach* case, the United States desired to construct military facilities on an island in San Diego Bay, which included tidelands. The owner derived title from a Mexican grant, and the patent issued pursuant to the Act of 1851 included the tidelands within the boundaries described therein. The high court held that the owner of the island had title to the tidelands and the federal government was required to pay compensation for their taking. In the course of its opinion, the court determined that the question whether there was a grant of the tidelands and boundaries of the grant had been decided in the confirmation proceedings, that California never had title to the tidelands by virtue of its sovereignty because they had been included in the Mexican grant and confirmed in the patentees, and that the grantees' title could not be collaterally attacked by the federal government.[13]

---

[13]The United States argued that the tidelands belonged to California, which had acquired title to them upon its admission to the Union. Rejecting this argument, the court stated, "But the title of the State was subject to prior Mexican grants. The question whether there was such a prior grant and what were its boundaries were questions that had to be decided in the proceedings for confirmation and there was jurisdiction to decide them as well if the decision was wrong as if it was right. The title of California was in abeyance until those issues were determined as the decree related back to the date of the original grant.... [A]lthough ... the grant could have been construed more narrowly, that was a matter to be passed upon and when the decree and the patent went in favor of the grantee it is too late to argue that they are not conclusive against the United States.... [H]owever arrived at it was adopted by the United States for its grant and it cannot now be collaterally impeached." (255 U.S. at pp. 487-488 [65 L.Ed. at pp. 741-742].)

This case, like the others relied upon by defendants, involves the question whether the title or boundaries of patented lands originating in Mexican grants may be collaterally attacked. In the present case plaintiffs concede that defendants have title to lots C and R; they claim, as did the state in our prior tidelands decisions, that the title of the landowners is subject to the rights of the public.

One case cited by defendants, in addition to *Moore*, considered the question whether a right in property other than title was included in a patent issued to a landowner who derived title from Mexico. In *United States* v. *Title Ins. Co.* (1924) 265 U.S. 472 [68 L.Ed. 1110, 44 S.Ct. 621], the court held that Indians who had the perpetual right to occupy certain lands under Mexican law, did not retain that right in lands patented to private parties under the Act of 1851 because of their failure to assert it in the patent proceeding.[14]

We do not find this case to be convincing authority. The right to occupy land is a normal incident of title, and we have no quarrel with the proposition that private persons who failed to assert their right to occupancy in the patent proceedings may not thereafter claim that right. But the right to exclude the public from tidelands is not a normal incident of title. To the contrary, as we have seen, conveyance of such lands by the government does not ordinarily free them from the burden of the public trust even though no reservation is made in the deed for the preservation of the people's interest.

It follows from what we have said that the federal government retained an interest in the tidelands in question when it issued the patent to defendants' predecessors, and that this interest was acquired by California upon its admission to statehood.

Our conclusion is supported not only by authority, but by policy as well. According to amicus curiae, California Land Title Association, most of the land along the Pacific Coast from San Diego to Sonoma is

[14]The court reasoned in part that "a claim of a right to permanent occupancy of land is one of far reaching effect, and it could not well be said that lands which were burdened with a right of permanent occupancy were a part of the public domain and subject to the full disposal of the United States.... Surely a claimant would have little reason for presenting to the land commission his claim of land, and securing a confirmation of that claim, if the only result were to transfer the naked fee to him, burdened by an Indian right of permanent occupancy." (265 U.S. at p. 484 [65 L.Ed. at pp. 1113-1114].)

situated in former Mexican ranchos. We do not know how much of the tidelands contained in these ranchos was conveyed by Mexico to private parties. If these areas of tidelands are free of the public interest, there is no right in the federal government, the state, or its successors, to improve or to use them for trust purposes without pursuing condemnation proceedings.

The result would be a California Mason-Dixon coastline dramatically divided between the north, in which the public trust doctrine is respected, and the south, where it is unrecognized. A dual system of rights would be created. Grantees whose title derives from Mexican grants would enjoy title free of the public trust, whereas those whose title did not originate with Mexico would hold their lands subject to the trust. The Treaty of Guadalupe Hidalgo requires only that the rights of Mexican grantees in their property shall be equal to that of citizens of the United States. (Treaty of Guadalupe Hidalgo, Art. VIII, 3 West's Cal. Const. (1954) 727, 732.) In view of this language, there is no justification for holding that a deed from the United States to its own citizens conveys lesser rights than a deed issued to grantees from Mexico, or that the public trust exists in tidelands north of Sonoma but not south of that point as to tidelands included in former Mexican ranchos.

In view of our conclusion, we need not discuss the trial court's findings that the public holds an easement in the property of defendants for the passage of fresh water to the Venice Canals and for water recreation, and that defendants' predecessors had dedicated the property for use as public streets or waterways. All these uses are included within the public trust. (*Marks* v. *Whitney* (1971) 6 Cal.3d 251, 259-260 [98 Cal.Rptr. 790, 491 P.2d 374].)[15]

We have examined other contentions made by the parties and find them to be without merit.

The judgment is affirmed.

Bird, C. J., Newman, J., and Broussard, J., concurred.

**RICHARDSON, J.**—I respectfully dissent.

---

[15]Our opinion is not to be understood as deciding matters which are raised by the parties but are not necessary to the determination of the issue before us. For example, although the state alleged in its cross-complaint that portions of the Ballona Lagoon which have been filled are still subject to the public trust, that issue is not involved in the present proceeding, since the property here consists entirely of tidelands.

In my view, the majority seriously errs in at least two respects, either of which independently is wholly sufficient to invalidate its reasoning and result. First, it extends the so-called "public trust doctrine," contrary to its fundamental rationale, to nonnavigable, nontidal waters on private property in which neither the state nor the federal government ever has asserted any title or interest. Second, it disregards the well established conclusive effect of the federal patent upon the subject property under the Act of 1851. I think the majority is wrong on both counts.

Along the way the majority cavalierly overturns a century-old judicial determination that the premises in question did *not* consist of tidal navigable waters. Disregarding the earlier federal court finding of fact the majority now, more than 100 years later, substitutes its own retroactive "finding" that the subject property was, indeed, then covered by tidal navigable waters. Resting upon its self-created factual premise, the majority attempts to justify *both* its disavowal of the federal patent of 1873 which had established the private ownership and nonnavigable character of the land in question *and* its use of the public trust doctrine, which heretofore has applied only to navigable waters previously owned by public entities. These conclusions, like their common premise, are flawed.

The subject real property consists of two parcels underlying what is popularly referred to as the Ballona Lagoon located in the Marina Del Rey area of Los Angeles. Historically, the lagoon was part of Rancho Ballona. Much of the area of the original lagoon is now dry land as a result of natural and developmental filling. In its present configuration the lagoon consists of a narrow elongated area covered by very shallow water described as "brackish," and separated from the ocean by a strand or sand barrier. There is a substantial question as to whether sea water presently flows through the lagoon in any significant amount. The majority concedes that the lagoon is seldom navigable, and then only by "shallow draft vehicles." (*Ante*, p. 292.)

I emphasize, however, that the current status of the lagoon has—or should have—little legal relevance to a proper resolution of the issues before us. In my view, our decision was foreordained over 100 years ago when it was *finally and judicially determined as a matter of fact* that Ballona Lagoon was not then an "arm of the sea" but rather belonged, along with the rest of Rancho Ballona of which it was a part, to its then Mexican grantees.

Historically, Rancho Ballona was a part of Mexico. In 1839 the Mexican Governor of California granted the rancho, including the lagoon, to Augustin and Ignacio Machado and Filipe and Tomas Talamantes. On July 7, 1846, following the Mexican War and upon completion of the military occupation of California, the then American military commander, Commodore Sloat, promised that Mexican land titles would be recognized by the United States. This policy was formalized in 1848, when California was ceded by Mexico to the United States, in the Treaty of Guadalupe Hidalgo. In that treaty the United States solemnly committed itself to respect the rights and property of Mexican citizens in newly ceded California. This covenant to protect previously established Mexican property rights affected all forms of ownership, and for over 100 years it has been judicially recognized both by the United States Supreme Court (*Knight* v. *U.S. Land Association* (1891) 142 U.S. 161, 184-185 [35 L.Ed. 974, 982, 12 S.Ct. 258]; *Beard* v. *Federy* (1865) 70 U.S. (3 Wall.) 478, 490 [18 L.Ed. 88, 92]) and by us (*Teschemacher* v. *Thompson* (1861) 18 Cal. 11, 22). Indeed, the majority acknowledges that "under the terms of the treaty, the rights of Mexican citizens to their property were to be 'inviolably respected.'" (*Ante,* p. 294.)

Consistent with these treaty obligations, the United States Congress enacted the Act of 1851 (the Act) which established procedures to be administered by a Board of Land Commissioners to confirm these rights. Under the Act, persons asserting ownership of California land through Mexican grants were required to submit their claims to the board, which was given broad powers to adjudicate the claims pursuant to the treaty, the laws of Mexico and the decisions of the United States Supreme court. Upon board approval of the claim, the property was surveyed by the United States Surveyor General and a patent thereupon issued using the survey description.

The Act further mandated that, once issued, the United States patent was to be binding and conclusive as to all persons save and except "third parties"—that is those who had an earlier title recognized under Mexican law. Because any such superior title had to exist prior to 1848 when the land was ceded to the United States, and because the State of California did not itself then exist, it has been consistently held both by the United States Supreme Court and by us that the "third parties" excepted under the Act did not include the state. (*Knight* v. *U.S. Land Association, supra,* 142 U.S. at pp. 185-186 [35 L.Ed. at pp. 982-983]; *People* v. *San Francisco* (1888) 75 Cal. 388, 403 [17 P. 522].)

In conformity with the Act, the 1839 Mexican grant of Rancho Ballona to the Machados and the Talamantes was formally confirmed by the Board of Land Commissioners in 1854, and affirmed on appeal by the United States District Court in 1855. Thereafter, the subject property was in litigation before the General Land Office for 18 years, the principal issue being the precise westerly boundary of the rancho, and particularly whether the "inner bay" (Ballona Lagoon) was within the rancho or part of the Pacific Ocean. The General Land Office, the duty of which was to "settle conflicting claims to the land surveyed," concluded that the "inner bay" (Ballona Lagoon) was *not* an arm of the sea but rather was "dry land used for pasturage" except during storms and times of overflow. Based upon the foregoing, *a United States patent on Rancho Ballona was finally issued in 1873 to the predecessors in interest of the present property owners.* The description used in the patent included the lagoon. The majority opinion assumes "without deciding" that the above factual determination as to the character of the lagoon "was a final decision on that question and a necessary predicate to the issuance of the patent." (*Ante*, p. 295.)

From the foregoing chronology, I conclude that the Rancho Ballona has been owned privately since 1839. The Mexican grant to the Machados and Talamantes, confirmed by the Board of Land Commissioners in 1854, affirmed by the United States District Court in 1855, approved by the Surveyor General of the United States in 1858, and having fully ripened into a United States patent in 1873, vested full legal title in fee simple absolute in the present owners' predecessors. In my view, this title has been free and clear of any right, title or interest of the State of California or any of its political subdivisions from that day to this.

It is significant that the private ownership of the lagoon was uniformly accepted for almost 100 years. In 1965, however, the City of Los Angeles, subsequently joined by the State of California, filed the present litigation which seeks both declaratory relief and quiet title. Los Angeles attempts, for the first time, to establish a public trust easement for "commerce, navigation and fishing" over the lagoon on a theory that the lagoon is tideland and navigable ocean water. Alternatively, plaintiffs allege an express or implied public easement over the lagoon. While now conceding, frankly, that defendants presently hold the fee simple title to the lots in question, plaintiffs argue that these lots, along with the entire lagoon, are burdened by a public trust easement.

It is obvious that much more is involved in this litigation than the title to two lots. By imposing a public trust easement upon properties which are neither tidal, navigable, nor formerly under public dominion, the majority has removed all heretofore recognized reasonable limitations on the scope of the public trust doctrine. What is left? While the majority refrains from defining the extent of the easement beyond the land under the water of the lagoon, the implications of its decision equally threaten large areas held in private ownership elsewhere in the coastal areas of this state. The private title to such property, and the right to use it, suddenly are clouded by the creation of a state-administered easement even though the state heretofore has neither owned such property nor asserted any interest in it.

There is no precedent for such an extension of public ownership. The Legislature has never reached so far, nor have we. In *City of Berkeley* v. *Superior Court* (1980) 26 Cal.3d 515 [162 Cal.Rptr. 327, 606 P.2d 362], a bare majority of this court first expounded the notion that *tidelands in navigable waters which had been conveyed by the state* to private parties nonetheless were encumbered by a reserved public trust for commerce, navigation, fishing and other uses. (*Id.*, at pp. 523, 528.) In the following year in *State of California* v. *Superior Court* (*Lyon*) (1981) 29 Cal.3d 210 [172 Cal.Rptr. 696, 625 P.2d 239], the same majority extended this new doctrine to lands between high and low water in *nontidal navigable lakes which had been granted by the state* into private ownership.

It should be carefully noted that the rationale of the public trust doctrine is that *public* lands conveyed into private ownership remain subject to public use for certain limited purposes unless the intention to extinguish that public right is clearly expressed in the grant. The doctrine operates when the ownership of land and waters vested in California upon its admission to the Union (*Borax, Ltd.* v. *Los Angeles* (1935) 296 U.S. 10, 15 [80 L.Ed. 9, 14, 56 S.Ct. 23]) is thereafter conveyed into private hands, the doctrine reserving in the public grantor a public trust. In short, the principle limits *subsequently created* private property rights. (*People* v. *California Fish Co.* (1913) 166 Cal. 576, 583-585 [138 P. 79].)

It seems to me obvious that this reasoning has no application to lands like those before us which *never* were owned publicly. Indeed, the majority freely acknowledges that we have never before applied the public trust doctrine to such property. (*Ante*, p. 298.) Nonetheless, my col-

leagues assert, without analysis, that prior government ownership is not essential to the application of that doctrine, but that unadorned, unsupported, bare conclusory assertion is not persuasive. In my view the majority thus errs in applying the public trust doctrine to the property before us, title to which has been exclusively in private ownership since 1839.

The second major error of the majority lies in its failure to acknowledge the binding effect of the federal patent issued to the predecessors in title of the present owners. After the lapse of a century, it reopens a factual issue conclusively resolved long ago in the federal proceedings. Citing no authority and without other justification, it thus endorses a collateral attack in the trial court upon the general judgment pursuant to which the patent was issued. It approves the superior court's reweighing of the evidence presented to the land commissioner in the federal proceedings 100 years earlier. It also accepts the superior court's belated "finding," based upon claimed inconsistencies in that evidence, that Ballona Lagoon *was* an "arm of the sea, subject to the tides." (*Ante*, p. 296.) Accordingly, the majority now concludes that the federal patent of 109 years ago was improperly issued.

Such a collateral attack upon the federal patent is highly improper. The purpose of the proceedings leading to the patent and the effect of its issuance was to *settle* permanently all claims which were, or which could have been, raised in those proceedings. Over 120 years ago in describing a patent we observed "Upon all matters of fact and law essential to authorize its issuance, it imports absolute verity ...." (*Leese* v. *Clark* (1861) 18 Cal. 535, 572.) Among the factual issues resolved in the 1873 patent proceedings were the boundaries and the character of the property which was granted by Mexico to its nationals, and particularly whether the lagoon was an "arm of the sea" or was included in the grant. The United States District Court decided it was the latter.

It is well established that the interpretation of a federal land conveyance is determined by federal law. (*Shively* v. *Bowlby* (1894) 152 U.S. 1, 9-10 [38 L.Ed. 331, 335, 14 S.Ct. 548].) This includes federal patents on real property, a portion of which is tidelands. (*Borax, Ltd.* v. *Los Angeles, supra*, 296 U.S. at p. 22 [80 L.Ed. at pp. 17-18].) As previously noted, the Ballona patent was issued by the United States government, pursuant to an act of Congress. This congressional action was ordained by the commitments made by our national government in

a treaty between the United States and Mexico. It is *federal not state* law that governs the interpretation of the patent before us.

The Act of 1851, pursuant to which the federal patent issued, contemplated not only the definition but also the *settlement* of titles. (*Knight* v. *U. S. Land Association, supra,* 142 U.S. at p. 184 [35 L.Ed. at p. 982]; *Beard* v. *Federy, supra,* 70 U.S. at p. 489 [18 L.Ed. at pp. 91-92]; *United States* v. *Coronado Beach Co.* (1921) 255 U.S. 472, 487-488 [65 L.Ed. 736, 741-742, 41 S.Ct. 378].) This was equally so whether the subject property was upland or tideland. As Mr. Justice Field sagely observed in his concurring opinion in *Knight*: "Mexico owned the tidelands as well as the uplands, and it was, of course, in her power to make such disposition of them in the establishment and organization of her pueblos [and ranchos] as she may have judged expedient. *And whether she did make such disposition by her laws was a matter exclusively for the United States to ascertain and determine.*" (142 U.S., at pp. 201-202 [35 L.Ed. at p. 988], italics added.)

The federal judgment which found that the lagoon was nontidal cannot be ignored, now, 100 years later, by a state court determination that it was then "tidal." Nor should the majority attempt to vacate a solemn federal conveyance recorded also over 100 years ago, thereby brushing aside both the federal judgment and conveyance and creating a sort of floating "tidal title" in order to extend the "public trust" doctrine to the subject property.

My colleagues insist that "when California was ceded by Mexico, the title of defendants' predecessors was subject to the interests of the public in the tidelands included in the grant." (*Ante,* p. 297.) The majority cites no cases whatever, Mexican, Spanish or American, federal or state, which have so held. In granting this property to the Machados and the Talamantes in 1839 Mexico may have had the power to reserve whatever interest it chose. The point is that there is no evidence whatever that it did limit or condition its grant. Moreover, the record before us is equally devoid of support for the novel proposition that *all* Mexican grants to private parties 140 years ago were subject to such an uncodified, Mexican or Spanish, "common law public trust." By its "recognition" of a reserved Mexican public interest 140 years after the fact, the majority retroactively imposes upon 19th Century Mexican jurisprudence a remedy never asserted by Mexico.

Serious adverse practical consequences flow from the majority's reasoning. In creating an implied "reservation" by Mexico of public rights in lands which it had granted to its nationals prior to the cession of California to the United States, the majority circumvents the clear import of section 13 of the federal Act of 1851. Under that section the United States acquired as its property *only* "lands which had belonged to Mexico and [which] were *not* patented by the federal government to private parties . . . ." (*Ante*, p. 296, italics added.) But the subject property here obviously *had* been patented to private parties. How, then, does the majority justify its assertion that "less than fee interests were retained by Mexico" and excepted from the Mexican grant of 1839 to the Machados and Talamantes, and somehow thereafter passed to the United States with the cession of California in 1846?

The majority seeks support for its theory of an implied reservation of public rights in patented lands by analogy to our decision in *Moore* v. *Smaw* (1861) 17 Cal. 199. Because we held in *Moore* that "mineral rights *retained* by the Mexican government" when it granted lands to its nationals subsequently passed to the United States on cession, it is urged that public rights in tidelands were similarly retained. (*Ante*, p. 296, italics added.) What my colleagues fail or refuse to note, however, is a very basic distinction between *Moore* and the present case. In *Moore* we stressed that at the time of the Mexican grant to the private *Moore* grantees "it was the established doctrine of the Mexican law that all mines of gold and silver in the country, though found in the lands of private individuals, were the property of the nation. No interest in the minerals passed by a grant from the Government of the land in which they were contained, without express words designating them . . . . The Mexican law on this subject was derived from the Spanish law . . . . Under Spain, the mines constituted the property of the crown, as part of the royal patrimony." (17 Cal. at pp. 212-213.) Not so in our case. At the time of the Mexican grant to defendants' predecessors in title, *no similar doctrine* traditionally established that such land grants were subject to a reservation of any "public trust rights."

In the absence of some legal authority or a factual determination of such reservation by Mexico, *Moore* provides absolutely no support for the majority's inventive concept that public trust rights were somehow silently "reserved" by Mexico when it conveyed the premises into private ownership in 1839; were then quietly passed to the United States upon cession; thereafter, without either notice or acknowledgment were handed to California upon its admission to the Union; survived the sub-

sequent issuance of a patent by the United States; lay dormant for over 100 years, and then, warmed by 143 summers, like a juridical century plant sprang suddenly into life and full bloom in 1982.

Of even more significance, however, in *Moore* we wholly destroyed the conceptual underpinnings of the majority's thesis. In carefully explaining the function of a federal patent, we there held that the patent *extinguished every interest* of the United States—*including the mineral rights* which we there concluded *had* passed to the federal government under established Mexican law pertaining to such rights. (*Moore, supra,* 17 Cal. at pp. 223-226.) We insisted that "The object of the act [of 1851] is to 'ascertain and settle' private land claims in California. This object is declared in the first section. It is not merely to ascertain but '*to settle' the claims*; that is, to establish them—to perfect them by *placing them, so far as the Government is concerned, beyond controversy.*" (*Id.,* at p. 223, italics added.)

Thus, with due deference to my colleagues, I suggest that even if there was substance to the majority's view that certain "public rights" were reserved by Mexico after its grant of 1839 to defendants' predecessors and that such rights somehow passed to the federal government, in *Moore* we flatly rejected the notion that any such rights could survive the patent process. Our language was unambiguous and explicit: "There is nothing in the act [of 1851] restricting the operation of the patents thus issued to the interests acquired by claimants from the former Government, or distinguishing the patents in any respect from the general class of conveyances made ... by the United States. *To all claimants alike, whose claims have been finally confirmed, patents are to issue without words of reservation or limitation* ...." (*Id.,* at p. 224, italics added.) The title and interest which the patentee receives, we described as: "*all the interest of the United States, whatever it may have been,* in everything connected with the soil, in everything forming any portion of its bed or fixed to its surface, in everything which is embraced within the signification of the term land ...." (*Ibid.,* italics added.) Thus, all interests, including mineral rights of the United States, were there held confirmed in the patentee upon issuance of the federal patent. It follows that if the federal patent absorbed and passed to the grantees even those rights which Mexico had historically reserved to itself, a fortiori, it would pass to the patentee any rights which Mexico neither expressly reserved nor historically, in its law, had asserted.

The fact, of course, that both our language and conclusions in *Moore* are venerable and that Californians have lived with them for over 100 years does not prove them wrong. Federal patents today remain the firm and stable bedrock of much of California's land titles. I conclude that the patentees to the property before us received *all* of the interests of the United States, including any inchoate public trust rights which knowingly or otherwise the United States may have received from Mexico upon the cession of California to the United States. Those interests vested in defendants' predecessors in title when their patent was properly confirmed in the federal patent proceedings.

The foregoing principles of land title law have been well established in California for a long, long time. Thus, 123 years ago, and 8 years after adoption of the Act and before the issuance of the present patent, we said "*The patent*, which is the final document issued by the government, *is conclusive evidence of the validity of the original grant*, and of its recognition and confirmation, and of the survey, and its conformity with the confirmation, *and of the relinquishment to the patentee of all the interest of the United States in the land. It cannot be attacked collaterally, even for fraud* . . . ." (*Moore* v. *Wilkinson* (1859) 13 Cal. 478, 487, italics added.) We have consistently, and from the beginning, given this same effect to a patent. (*Teschemacher* v. *Thompson, supra*, 18 Cal. 11, 26-28; *Morrill* v. *Chapman* (1868) 35 Cal. 85, 88; *Miller* v. *Dale* (1872) 44 Cal. 562, 578; *Chipley* v. *Farris* (1873) 45 Cal. 527, 538-539; *Cassidy* v. *Carr* (1874) 48 Cal. 339, 344; *People* v. *San Francisco, supra*, 75 Cal. 388, 397.)

The United States Supreme Court has been equally consistent. Over a century ago it characterized as follows the effect of a patent and the nature of the conveyance confirmed thereby: "[T]he patent is a record of the action of the government upon the title of the claimant as it existed upon the acquisition of the country . . . . When informed, by the action of its tribunals and officers, that a claim asserted is valid and entitled to recognition, the government acts, and issues its patent to the claimant. This instrument is, therefore, record evidence of the action of the government upon the title of the claimant. By it the government declares that the claim asserted was valid under the laws of Mexico; that it was entitled to recognition and protection by the stipulations of the treaty, and might have been located under the former government, and is correctly located now, so as to embrace the premises as they are surveyed and described. *As against the government this record, so long as it remains unvacated, is conclusive. And it is equally conclusive against parties claiming under the government by title subsequent. It is in this*

*effect of the patent as a record of the government that its security and protection chiefly lie."* (*Beard* v. *Federy, supra,* 70 U.S. at pp. 491-492 [18 L.Ed. at pp. 92-93], italics added; accord *Dominguez De Guyer* v. *Banning* (1897) 167 U.S. 723, 740-744 [42 L.Ed. 340, 345-347, affirming *De Guyer* v. *Banning* (1891) 91 Cal. 400, 402-404 [27 P. 761]; *Thompson* v. *Los Angeles Farming & M. Co.* (1901) 180 U.S. 72, 77-80 [45 L.Ed. 432, 434-436, 21 S.Ct. 289].)

In *United States* v. *Coronado Beach Co., supra,* 255 U.S. 472, the Supreme Court held that the owner of realty, including tidelands, which was acquired by a Mexican grant and subsequently confirmed in federal patent proceedings, could not be deprived of its property without just compensation. The high court specifically emphasized that California never acquired title to the tidelands by virtue of its sovereignty because the property had been included in the Mexican grant, and having been confirmed in the patent proceedings, such title could not be collaterally attacked. (*Id.,* at p. 488 [65 L.Ed. at p. 742].) The same analysis, applicable here, compels a similar legal conclusion.

I find singularly unpersuasive the majority's attempt to distinguish cases such as *United States* v. *Title Ins. Co.* (1924) 265 U.S. 472 [68 L.Ed. 1110, 44 S.Ct. 621], wherein the Supreme Court concluded that the perpetual right of Indians under Mexican law to use and occupy certain lands was lost when those lands were granted to Mexican nationals whose title was subsequently confirmed in the patent process. Finding that the "right to occupy land is a normal incident of title," the majority correctly concludes that such right must be asserted in the patent process or is lost. (*Ante,* p. 302.) With respect to the public right to use tidelands, however, the majority concludes otherwise. Offering no rationale for any such distinction, the majority simply declares, *ipse dixit,* that such a public interest *need not* be asserted in order to survive the federal patent process *because* the "conveyance of such lands by the government does not ordinarily free them from the burden of the public trust . . . ." (*Ante,* p. 302.) Such reasoning is, of course, circular, is sustained by no authority, and cannot be reconciled with our own long established holding that *"all* the interest of the United States, *whatever* it may have been" passes to the patentee upon issuance of a patent under the Act of 1851. (*Moore* v. *Smaw, supra,* 17 Cal. at p. 224, italics added.)

From all of the foregoing, I conclude that the subject property was owned by the government of Mexico until 1839, at which time it passed

into private ownership. The State of California at that time, of course, did not exist. Assuming, for discussion purposes, that any "public interest" in such property had been retained by Mexico, such interest thereafter inevitably passed to the United States upon cession by Mexico. Surely, the interest could not have been retained by Mexico after cession. Pursuant to appropriate congressional authorization, the federal government subsequently entertained claims, public and private, to lands within California which formerly were conveyed by the Mexican government into private ownership. The property in question was subjected to these appropriate proceedings. As noted, the claims of defendants' predecessors in title were considered and affirmed in a valid judgment of the United States District Court which applied the binding federal law, the property was surveyed, the boundaries litigated, and finally in 1873 a United States patent was properly issued to defendants' predecessors. Both the United States and the State of California had ample opportunity in those proceedings to assert any "public trust" interests that they might claim. They did not do so. To me, the record eloquently reflects that for over a century none of the parties harbored the notion that the rancho lands in question contained any lingering "trust" encumbrance. No case, federal or state, American or Mexican, has ever so held before today.

The detailed procedure established by Congress in its Act of 1851 was a forthright, direct and common sense method for resolving title. It is relevant to note that the title confirmatory proceedings were designed to resolve not some but *all* conflicting and disputed interests.

In the words of the high court: "[T]he purpose of the Act of 1851 was to give repose to titles as well as to fulfill treaty obligations, and . . . it not only permitted but required all claims to be presented to the commission, and barred all from future assertion which were not presented within the two years." (*United States* v. *Title Ins. Co., supra,* 265 U.S. at p. 483 [68 L.Ed. at p. 1113].) All claims not so presented were "regarded as abandoned." (*Ibid.*) The high tribunal in that case expressed an interpretive principle which has equal application here: "'Where questions arise which affect titles to land it is of great importance to the public that when they are once decided they should no longer be considered open. Such decisions become rules of property, and many titles may be injuriously affected by their change. Legislatures may alter or change their laws, without injury, as they affect the future only; but where courts vacillate and overrule their own decisions on the construction of statutes affecting the title to real property, their deci-

sions are retrospective and may affect titles purchased on the faith of their stability. Doubtful questions on subjects of this nature, when once decided, should be considered no longer doubtful or subject to change.'" (*Id.*, at pp. 486-487 [68 L.Ed. at p. 1114].)

The majority, however, purports to discover and by a judicial nudge to waken from its 109-year slumber a dormant public interest of the State of California in the lands in question. It does so at the expense of the constitutionally protected property rights of defendants.

I confess to a growing unease about what I view as an accelerating erosion of private property rights of California citizens. We need look no further than the first section of the very first article of the state Constitution to learn that the sovereign people of California have proclaimed: "All people are by nature free and independent and have *inalienable rights.* Among these are enjoying and defending life and liberty, *acquiring, possessing, and protecting property*, and pursuing and obtaining safety, happiness, and privacy." (Italics added.) From this solemn pronouncement of the people, identifying the protection of their property with the defense of their lives and liberty and describing such interests as "inalienable," I conclude that preserving the sanctity of a citizen's private property is a singular responsibility of government and its courts. When, therefore, that government itself seeks to trench on such constitutionally protected and "inalienable rights" of its own people, its conduct must be closely scrutinized and its reach carefully measured by the rule of law.

If the State of California or the City of Los Angeles seeks to "dredge the lagoon, construct sea walls" and otherwise now assert public dominion over the subject property and if either can demonstrate some valid public use, let it frankly, fairly and openly exercise its eminent domain power. Pursuant to the Fifth Amendment to the federal Constitution and article I, section 19 of the California Constitution, let state and city pursue established legal procedures to condemn the property in question, rather than upset long established principles in order to obtain the property "on the cheap," as it were. In compliance with the constitutional restrictions which are binding upon them, if the state and city now seek the use of the subject property, they should pay for it.

I would reverse the judgment.

KAUS, J.—I respectfully dissent.

As I read the applicable federal decisions, the dispositive issue in this case—namely, whether defendants' title to property deriving from a federal patent is subject to an overriding state "tidelands trust"—is a matter of federal, not state, law. (See, e.g., *State Land Board* v. *Corvallis Sand & Gravel Co,* (1977) 429 U.S. 363, 375 [50 L.Ed.2d 550, 561, 97 S.Ct. 582]; *Knight* v. *U.S. Land Association* (1891) 142 U.S. 161 [35 L.Ed. 974, 12 S.Ct. 258].) In discussing California's interest in tidelands, *every* United States Supreme Court decision to which our attention has been directed draws a clear distinction between tidelands that passed to the state as sovereign, and tidelands—like those involved in the present case—that had been ceded by Mexico to private parties and whose title was later confirmed by a federal patent pursuant to the elaborate procedures adopted by the federal government to comply with the Treaty of Guadalupe Hidalgo. These decisions uniformly hold that whereas California obtained a sovereign interest in the former category of tidelands under the general common law public trust doctrine, "[t]here is the established qualification that this principle is not applicable to lands which had previously been granted by Mexico to other parties . . . ." (*Borax, Ltd.* v. *Los Angeles* (1935) 296 U.S. 10, 15-16 [80 L.Ed. 9, 14, 56 S.Ct. 23]; *United States* v. *Coronado Beach Co.* (1921) 255 U.S. 472, 487-488 [65 L.Ed. 736, 741-742, 41 S.Ct. 378]; *Shively* v. *Bowlby* (1894) 152 U.S. 1, 30-31 [38 L.Ed. 331, 342-343, 14 S.Ct. 548]; *Knight* v. *U.S. Land Association, supra,* 142 U.S. 161, 183-184 [35 L.Ed. 974, 981-982]; *San Francisco* v. *LeRoy* (1891) 138 U.S. 656, 670-671 [34 L.Ed. 1096, 1101, 11 S.Ct. 364].)

In my view, the majority gives an artificially narrow reading to these numerous federal decisions in suggesting that the cases are limited to the question of whether California obtained "title" to the tidelands and that they do not bear on the question of whether California acquired an allegedly independent "tidelands trust" interest in this property. As I understand the governing federal tidelands cases, the special "public trust" which adheres in tidelands—and which operates to limit the legislative prerogative in determining to what uses such lands may be put—flows directly from the initial sovereign ownership of these tidelands. (See *Illinois Central Railroad Co.* v. *State of Illinois* (1892) 146 U.S. 387, 452-454 [36 L.Ed. 1018, 1042-1043, 13 S.Ct. 110]; *Martin* v. *Waddell* (1842) 41 U.S. (16 Pet.) 367, 409-414 [10 L.Ed. 997, 1012-1014]; cf. *People* v. *California Fish Co.* (1913) 166 Cal. 576, 584-587 [138 P. 79]; *City of Berkeley* v. *Superior Court* (1980) 26 Cal.3d 515, 521-525 [162 Cal.Rptr. 327, 606 P.2d 362]; *State of California* v. *Superior Court* (*Lyon*) (1981) 29 Cal.3d 210, 226-231 [172

Cal.Rptr. 696, 625 P.2d 239].) Thus, if—as a matter of federal law—California never owned these tidelands in trust for the public, the keystone on which the application of the public trust doctrine rests is missing.[1]

It should be understood, of course, that even in the absence of the public trust doctrine, state and local governments retain broad power to regulate the property in question for environmental, navigational, and recreational purposes and the like. Although this broad regulatory power may not afford the City of Los Angeles authority to enter on and alter defendants' property without compensation, this extensive legislative control does suggest to me that the majority's concern over the problems ostensibly emanating from a "Mason-Dixon coastline" is probably overstated. In any event, the policy considerations which might legitimately influence our decision if this were a matter of state law, clearly cannot override the governing United States Supreme Court decisions on a matter of federal law. Because I find the majority's conclusion inconsistent with those decisions, I dissent.[2]

The petition of appellant Summa Corporation for a rehearing was denied June 16, 1982. Richardson, J., and Kaus, J., were of the opinion that the petition should be granted.

---

[1] I find nothing in the federal cases that would support the conclusion that when the United States issued a federal patent confirming private interests in property acquired pursuant to an earlier grant from Mexico, the federal government—as a matter of federal law—retained a hidden "tidelands trust" interest which later passed to California. (See, e.g., *Knight* v. *U.S. Land Association, supra*, 142 U.S. at pp. 185-189 [35 L.Ed. at pp. 982-984]; *Beard* v. *Federy* (1866) 70 U.S. (3 Wall.) 478, 491 [18 L.Ed. 88, 92].)

[2] Because the majority opinion upholds the trial court's decision on the public trust theory, it does not reach that court's alternative findings that past usage of the property at issue gave rise to a public easement for the passage of fresh water and a dedication for use as public streets or waterways. Since my feelings about these alternative holdings would not affect the outcome of the case in any event, I express no view as to the validity of those conclusions.