[Civ. No. 46963. First Dist., Div. Three. Dec. 23, 1982.]

APTOS SEASCAPE CORPORATION, Plaintiff,
Cross-defendant and Appellant, v.
COUNTY OF SANTA CRUZ et al., Defendants,
Cross-complainants and Appellants.

486

## COUNSEL

Dennis J. Kehoe, G. Dana Scruggs III, Adams, Levin, Kehoe, Bosso, Sachs & Bates, Peter L. Townsend, Garrison, Townsend, Hall, Orser & Park and Garrison, Townsend & Orser for Plaintiff, Cross-defendant and Appellant.

Clair A. Carlson, County Counsel, and James M. Ritchey, Assistant County Counsel, for Defendants, Cross-complainants and Appellants.

T. Roy Gorman as Amicus Curiae on behalf of Defendants, Cross-complainants and Appellants.

## OPINION

**SCOTT, J.**—The County of Santa Cruz (County) and others appeal from a judgment in an inverse condemnation action awarding Aptos Seascape Corporation (Seascape), a California corporation, over $3 million. The County also appeals from an adverse judgment on its cross-complaint, which alleged an implied dedication to the public of certain of Seascape's beach property.

### The Facts

Seascape owns approximately 110 acres of real property in Santa Cruz County, bounded by the Southern Pacific Railroad tracks, Monterey Bay, Camp St. Francis, and an existing residential tract.[1] The 110 acres include approximately 40 acres which are above the 100-foot contour line (the benchlands), and approximately 70 acres below that contour line. The 70 acres include a beach about a mile long, arroyos, and a line of cliffs, or palisades. It is the 70 acres which are at issue here, and they will be referred to as the "Subject Property." The benchlands include three parcels, designated parcels A, B, and C. Before the property was purchased, it was zoned unclassified. As a condition of its purchase, it was rezoned; the 110 acres were zoned residential, with a commercial hotel use allowed on one section of the benchlands.

In 1967 the County adopted the Aptos General Plan (Plan), which indicated that the subject property should remain as open space, or beach and palisades,

---

[1]The 110 acres are part of 500 acres which Seascape purchased in 1963. In addition to the 110 acres, Seascape still owns approximately 200 acres of "uplands," up the hill and away from the beach; it has developed and sold about 190 acres.

ravines and forests. According to the Plan, benchlands parcels A and C would be zoned medium density residential (maximum 6 units per acre), and parcel B, medium high density residential (maximum 8 units per acre), with a hotel as an alternate use. The Plan also stated that although development on beaches should be prohibited, compensating higher densities should be permitted on other portions of property in the same ownership. The Plan proposed formation of a new planned community district in the area in part to implement the award of compensating densities. No such district has ever been formed.

In March 1971 Seascape submitted a tentative subdivision map for the 110-acre parcel. In response, the board of supervisors enacted an interim emergency zoning ordinance to preclude Seascape from further processing any land use proposals until the County completed its study of the area. The application for the map was denied as inconsistent with the Plan. The interim zoning ordinance was extended three times.

Seascape submitted no other formal map or subdivision applications. It did, however, informally submit a development proposal to the planning commission. Although the commission took no action on that plan, it recommended to the board of supervisors a rezoning which would in effect have prohibited development on the subject property, but which would have increased the density recommended by the Plan for benchlands parcels A and C, and allowed a hotel on parcel C.

The County rejected that recommendation. In December 1972 it adopted ordinance 1800, zoning the subject property as U-BS, (unclassified—special building site area regulations) and the benchlands R-1-6-PD (one family residence—planned development district: 6,000 sq. ft. minimum site area).

On March 27, 1973, the County board adopted a Parks, Recreation and Open Space Plan (PROS), which designated the subject property as "acquisition only —immediate action—low priority." In 1974 the County adopted a new Aptos General Plan, in which the property is designated as "Open reserve; park-playground."

In June 1973 Seascape filed a first amended complaint for damages, inverse condemnation and declaratory relief against the County, and others. Seascape alleged that by rezoning, the County deprived it of all reasonable use of certain of its real property, in effect taking that property without paying just compensation. Seascape sought damages of $23 million for the property allegedly taken, $12 million for severance damage to adjacent property, and a declaration invalidating the zoning ordinance. The County cross-complained for declaratory

and injunctive relief, alleging that a part of Seascape's property had been impliedly dedicated to the public.

Court trial was held in November 1977. Among its findings, the court found: (1) the Subject Property has always been treated by the County as a parcel separate from the benchlands, and is a "de facto separate parcel"; (2) the only reasonable use that can be made of the Subject Property is for residential purposes; (3) the effect of ordinance 1800 is to allow no development at all on the Subject Property, and to allow a maximum density of one site per 6,000 square feet on the benchlands, with no compensating higher densities permitted; (4) the County does not intend to grant Seascape any compensating higher densities on the benchlands in the future; (5) the County has precluded all reasonable use of the Subject Property and has therefore taken the property to preserve it as open space; (6) Seascape has fully exhausted all available administrative remedies, and any additional attempt to petition the County for relief would be futile; (7) just compensation in the amount of $3.15 million (the fair market value of the Subject Property as of Dec. 5, 1972) is due and owing to Seascape.[2]

The court ordered entry of an alternative judgment. As an alternate means of compensation, and in lieu of payment of damages, the judgment granted Seascape compensating higher densities of 40 residential units on its benchlands and 160 residential units on its uplands, "in addition to any other uses and densities that the benchlands and uplands . . . may otherwise yield, which underlying uses and densities are herein referred to as 'Base Densities.' Said Base Densities shall be reasonable and shall not be reduced for the purpose of avoiding the effect of this Judgment." Upon issuance of building permits by the County and substantial construction by Seascape, Seascape was to convey an open-space easement in perpetuity for the subject property to the County. If Seascape had not received all of the compensating higher densities called for within five years from the date of entry of the judgment, it was to be paid the full damage award. If it had received some but not all of those compensating densities, it was to be paid $15,750 for each unit not received within the five-year period. This alternative was at the option of the County, which was to (1) file a written notice of acceptance within 60 days of the date of the filing of the entry of judgment, accompanied by a resolution of the board authorizing acceptance, and (2) enact enabling ordinances within that time period. The alternate was void if not exercised. The County did not elect the alternative, and instead appealed from the judgment.

---

[2]The facts and the court's findings with respect to the cross-complaint will be set forth in conjunction with the discussion of that complaint.

*Seascape's Complaint*[3]

I

In March 1979, two months after judgment was entered in this case, the California Supreme Court held that a landowner who alleges that a zoning ordinance has deprived him of substantially all use of his land, in violation of the Fifth and Fourteenth Amendments of the United States Constitution and article I, section 19 of the California Constitution, may attempt to invalidate the ordinance as excessive regulation through declaratory relief or mandamus, but may not sue in inverse condemnation for damages. (*Agins* v. *City of Tiburon* (1979) 24 Cal.3d 266, 273 [157 Cal.Rptr. 372, 598 P.2d 25], affd. on another ground, *Agins* v. *Tiburon* (1980) 447 U.S. 255 [65 L.Ed.2d 106, 100 S.Ct. 2138].)

The County first argues that in light of *Agins,* the judgment awarding damages must be reversed. Seascape contends that *Agins* is inapplicable because its discussion of the availability of inverse condemnation was dictum, which has "evaporated" with the United States Supreme Court's decision in *San Diego Gas & Electric Co.* v. *San Diego* (1981) 450 U.S. 621 [67 L.Ed.2d 551, 101 S.Ct. 1287].

In *Agins* plaintiffs owned five acres of unimproved land in Tiburon, which they acquired for residential development. The city adopted widespread zoning modifications, designating plaintiffs' land for one-family dwellings and open-space uses. As applied to plaintiffs' five acres, the zoning would permit a maximum of five dwelling units or a minimum of one. The city filed a complaint in eminent domain to acquire the property as open space, but then abandoned those proceedings. Plaintiffs did not make any application to use the property. Instead, they filed a complaint in inverse condemnation and for declaratory relief, alleging the adoption of the ordinance completely destroyed the value of their property. A demurrer was sustained without leave to amend.

The California Supreme Court affirmed. "[T]he need for preserving a degree of freedom in the land-use planning function, and the inhibiting financial force which inheres in the inverse condemnation remedy" persuaded the court that on balance, mandamus or declaratory relief rather than inverse condemnation was the appropriate remedy. (*Agins, supra,* 24 Cal.3d at pp. 276-277.) The court then concluded that plaintiffs had not established their entitlement to declaratory relief. "[A] zoning ordinance may be unconstitutional and subject to invalidation only when its effect is to deprive the landowner of substantially all

---

[3]The California Coastal Commission has filed an amicus curiae brief on behalf of the County in its appeal from the judgment on the complaint.

reasonable use of his property." (*Id.*, at p. 277.) Because the ordinance on its face permitted plaintiffs to build between one and five residences on their acreage, as a matter of law it did not unconstitutionally interfere with their entire use of the land or impermissibly decrease its value. (*Ibid.*)

As the *Agins* court in effect concluded that there had been no "taking" of plaintiffs' land, it can be argued that its rejection of inverse condemnation as an available remedy for a taking was not necessary to its decision and was therefore dictum. Nevertheless, as the inverse condemnation issue appears to have been elaborately considered, it is obviously entitled to great weight. (6 Witkin, Cal. Procedure (2d ed. 1971) Appeal, § 678, p. 4591, and cases cited therein.) In addition, it is apparent that the Supreme Court itself did not intend its discussion to be considered dictum (see *Furey* v. *City of Sacramento* (1979) 24 Cal.3d 862, 871 [157 Cal.Rptr. 684, 598 P.2d 844]), and it has not been treated as such in subsequent Court of Appeal cases. (See, e.g., *Liberty* v. *California Coastal Com.* (1980) 113 Cal.App.3d 491, 498 [170 Cal.Rptr. 247]; *Gilliland* v. *County of Los Angeles* (1981) 126 Cal.App.3d 610, 617 [179 Cal.Rptr. 73].) Seascape's suggestion that this court treat *Agins'* inverse condemnation discussion as dictum is unpersuasive.

Seascape's contention that *Agins* has been disapproved by the United States Supreme Court is also without merit. While that court has expressed reservations about whether a government entity may constitutionally limit the remedy available for a "taking" to nonmonetary relief, it has not yet squarely confronted the question.

*Agins* itself was affirmed by the United States Supreme Court on the ground that no taking had occurred, and the court did not consider whether a state may limit the remedies available to a person whose land has been taken without just compensation. (*Agins* v. *Tiburon, supra,* 447 U.S. 255, 263 [65 L.Ed.2d 106, 113].) In *San Diego Gas & Electric Co.* v. *San Diego, supra,* 450 U.S. 621, upon which Seascape primarily relies, a power company owned over 200 acres in San Diego where it intended to build a power plant. The city rezoned the property in part as "open space." The company brought an action for inverse condemnation, and was awarded over $3 million. While the case was pending before the California Supreme Court, *Agins* was decided and the case was retransferred to the Court of Appeal for reconsideration. That court, in an unpublished opinion, relied on *Agins* to hold (1) the company could not recover compensation through inverse condemnation; and (2) factual questions remained before it could be determined whether the company had been denied all use of its land. (*Id.,* at pp. 629-632 [67 L.Ed.2d at pp. 559-560].)

The United States Supreme Court dismissed the appeal for lack of a final judgment, as it had not yet been decided whether any taking in fact occurred.

Nevertheless, the court cautioned that the federal constitutional aspects of the state court's decision that the company was not entitled to a monetary remedy "are not to be cast aside lightly . . . ." (*Id.*, at p. 633 [67 L.Ed.2d at p. 561].) Dissenting, Justice Brennan and three others reached the constitutional question, and would have held that once a court establishes a regulatory "taking," the Constitution demands that the government entity pay just compensation for the period commencing on the date the regulation first effected the "taking," and ending on the date the government chooses to rescind or otherwise amend the regulation. (*Id.*, at p. 658 [67 L.Ed.2d at p. 576].) Justice Rehnquist concurred with the majority that there had been no final judgment, but also noted that if the appeal were from a final judgment, he would "have little difficulty in agreeing with much of what is said" in the dissent. (*Id.*, at pp. 633-634 [67 L.Ed.2d at pp. 561-562].)

While the United States Supreme Court may eventually conclude that California cannot limit the remedy available for a taking to nonmonetary relief, it has not yet done so, and this court is obligated to follow *Agins*. (*Auto Equity Sales, Inc.* v. *Superior Court* (1962) 57 Cal.2d 450, 455 [20 Cal.Rptr. 321, 369 P.2d 937].) That portion of the judgment awarding respondent Seascape damages in inverse condemnation must be reversed.

## II

 Although the trial court found that the subject property had been taken without just compensation, it concluded that the County's "zoning enactments" were a valid exercise of its police power, beyond attack except in an inverse condemnation action, and dismissed Seascape's cause of action to declare ordinance 1800 invalid. Seascape has cross-appealed from that dismissal.

The trial court reached its conclusion without the benefit of *Agins*, in which the court held that if the effect of a zoning ordinance deprives the landowner of "substantially all reasonable use of his property," the ordinance may be unconstitutional and subject to invalidation. (*Agins, supra,* 24 Cal.3d at p. 277.) In light of *Agins*, it is apparent that the trial court's conclusion is inconsistent with its finding that Seascape has not been allowed any reasonable use of the subject property. If that finding is correct, this court may reverse with directions to enter judgment for Seascape declaring ordinance 1800 invalid on its face.[4] (See 6 Witkin, Cal. Procedure (2d ed. 1971) Appeal, § 547, p. 4488.)

---

[4]Declaratory relief is the appropriate remedy by which to seek a declaration that a zoning ordinance is facially unconstitutional. (*Agins, supra,* 24 Cal.3d at pp. 272-273; see *State of California* v. *Superior Court (Veta)* (1974) 12 Cal.3d 237, 251 [115 Cal.Rptr. 497, 524 P.2d 1281].) A landowner who seeks to challenge the constitutionality of an act's application to his or her lands [i.e., when a development plan has been disapproved] must proceed by administrative mandamus. (*Agins*, at p. 273.)

■ The County and amicus California Coastal Commission argue, however, that the court's finding is erroneous. They attack that finding on alternative grounds. First, they argue that the court erred as a matter of law when it considered the 70-acre subject property in isolation to determine whether there had been a taking. Instead, it should have considered whether ordinance 1800 deprived Seascape of all reasonable use of its entire 110-acre parcel. Second, they urged that even if the subject property can properly be considered as a separate parcel, there was no taking because Seascape can be awarded density credits on its 40 acres of benchlands (or on its 200 acres of uplands) to compensate for the prohibition against building on the subject property. While they concede that no such credits have yet been awarded, they argue that the trial court erred when it found that the zoning ordinances absolutely preclude the award of density credits on the benchlands. In a related argument, the County and amicus also argue that because Seascape has not submitted a development plan for the 110 acres, it failed to exhaust its administrative remedies.

There is no litmus paper test under either federal or state law to determine when a taking has occurred. "[W]hether a regulation is excessive in any particular situation involves questions of degree, turning on the individual facts of each case . . . ." (*Agins* v. *City of Tiburon, supra,* 24 Cal.3d at p. 277.) The United States Supreme Court has declared itself unable to develop any set formula for determining what constitutes a "taking" for purposes of the Fifth Amendment. (*Penn Central Transp. Co.* v. *New York City* (1978) 438 U.S. 104, 123-124 [57 L.Ed.2d 631, 647-648, 98 S.Ct. 2646].) "The application of a general zoning law to particular property effects a taking if the ordinance does not substantially advance legitimate state interests, see *Nectow* v. *Cambridge,* 277 U. S. 183, 188 (1928), or denies an owner economically viable use of his land, see *Penn Central Transp. Co.* v. *New York City,* 438 U. S. 104, 138, n. 36 (1978). The determination that governmental action constitutes a taking is, in essence, a determination that the public at large, rather than a single owner, must bear the burden of an exercise of state power in the public interest. Although no precise rule determines when property has been taken, see *Kaiser Aetna* v. *United States,* 444 U. S. 164 (1979), the question necessarily requires a weighing of private and public interests." (*Agins* v. *Tiburon, supra,* 447 U. S. at pp. 260-261 [65 L.Ed.2d at pp. 111-112].)

Decisional law under the takings clause of the federal Constitution has been described as "hopelessly confused," with lower courts differing widely in their analytical frameworks for resolving takings challenges. (Note, *Developments—Zoning* (1978) 91 Harv.L.Rev. 1427, 1464.) That confusion is particularly apparent in cases with facts similar to those at issue, where a property owner alleges that governmental action restricting the use of a portion of his property constitutes a taking. Some courts consider the only question to be the effect of the regulations on the whole of the owner's contiguous property. (See, e.g.,

*Am. Dredging* v. *State, Dept. of Environ. Pro.* (1979) 169 N.J.Super. 18 [404 A.2d 42]; *Multnomah County* v. *Howell* (1972) 9 Ore.App. 374 [496 P.2d 235, 238].) Other courts focus on the restricted acreage, but also consider whether development rights have been denied outright, or transferred elsewhere. (See, e.g., *American Sav. & Loan Ass'n* v. *County of Marin* (9th Cir. 1981) 653 F.2d 364; *Fifth Avenue Corp.* v. *Washington County, etc.* (1978) 282 Ore. 591 [581 P.2d 50].)

We are persuaded that the approach suggested in *American Sav. & Loan Ass'n* v. *County of Marin, supra,* 653 F.2d 364 is the appropriate one, as it appears to provide for the most equitable accommodation of the conflicting public and private interests at stake in a "takings" challenge such as this one. As in this case, the dispute in *American Sav. & Loan Ass'n* involved contiguous acreage under a single ownership, but subject to different zoning restrictions. Plaintiff owned Strawberry Point (20 acres) and Strawberry Spit (48 acres), two contiguous parcels. Marin County adopted a zoning ordinance allowing one multiple residential unit per five acres on the spit, and four per acre on the point. Plaintiff filed suit, claiming the ordinance was facially unconstitutional as applied to both parcels. Summary judgment for the County was granted, on the ground that the zoning permitted a reasonable profitable use of plaintiff's property as a whole.

The appellate court rejected the trial court's approach. It framed the question as ". . . whether the challenged ordinance create[d] two separate parcels for taking purposes by adopting different zoning designations for each parcel." (*Id.,* at p. 370.) That question, the court explained, was one of fact which could not be resolved on summary judgment. Plaintiff's allegations that it had been deprived by a nonuniform ordinance of a substantial, economically viable portion of its property tended to require that the spit be evaluated separately for taking purposes. Nevertheless, without a development plan, it was impossible to tell whether plaintiff had actually been deprived of rights, or whether the county would make some provision for the transfer of those rights, i.e., through density transfers. Only when it was clear how the property would be treated at the development stage could a court determine "whether justice and fairness require[d] that [the property owner's] loss be compensated by the government." (*Id.,* at p. 372.) In other words, when governmental action has divided contiguous property under single ownership into separate zones, and has restricted development in one of those zones, a provision allowing some transfer of development rights from the restricted property or awarding compensating densities elsewhere may preclude a finding that an unconstitutional taking has occurred.

In support of their argument that the court should not have looked at the subject property in isolation, the County and amicus rely on *Penn Central Transp.*

*Co.* v. *New York City, supra,* 438 U.S. at page 130 [57 L.Ed.2d at page 652], wherein the Supreme Court stated: " 'Taking' jurisprudence does not divide a single parcel into discrete segments and attempt to determine whether rights in a particular segment have been entirely abrogated. In deciding whether a particular governmental action has effected a taking, this Court focuses rather both on the character of the action and on the nature and extent of the interference with rights in the parcel as a whole . . . ."

*Penn Central* is factually distinguishable, however. The language upon which the County and amicus rely was the Supreme Court's response to an argument that a taking could be established merely by showing that an owner's ability to use air rights above Grand Central Terminal had been restricted by the applicability of New York City's Landmarks Preservation Law. (*Penn Central, supra,* 438 U.S. at p. 130 [57 L.Ed.2d at p. 652].) The case did not involve contiguous property for which different zoning designations were adopted, and the court's broad language does not resolve the question presented here. (See *American Sav. & Loan Ass'n, supra,* 653 F.2d at pp. 369-370.)

First, we note that the trial court made a special finding that the County has had the power at all times material herein to determine the base or basic densities for Seascape's uplands, and the compensating higher densities, if any, that would be added to that base density. With respect to the benchlands, however, the court concluded that the County's zoning ordinances absolutely precluded any grant of compensating densities. As we will explain, we have concluded that the court's construction of those ordinances was erroneous, and that the County can grant Seascape compensating densities on both its uplands and benchlands.

■ The rules of statutory construction are applicable to local ordinances (*Kortum* v. *Alkire* (1977) 69 Cal.App.3d 325, 334 [138 Cal.Rptr. 26]; see *Kasunich* v. *Kraft* (1962) 201 Cal.App.2d 177, 183 [19 Cal.Rptr. 872]), and the construction of a statute or ordinance is a question of law for the court. (*Wilson* v. *County of Santa Clara* (1977) 68 Cal.App.3d 78, 84 [137 Cal.Rptr. 78].) ■ Generally legislation should be construed, if reasonably possible, to preserve its constitutionality. (*Kash Enterprises, Inc.* v. *City of Los Angeles* (1977) 19 Cal.3d 294, 305 [138 Cal.Rptr. 53, 562 P.2d 1302].) When two alternative interpretations of a statute or ordinance are presented, one of which may be unconstitutional and the other constitutional, the court will choose that construction which will uphold the validity of the statute. (*Kortum* v. *Alkire, supra,* at p. 334.) ". . . [T]he constitutionality of statutes ought not be decided except in an actual factual setting that makes such a decision necessary. [Citations.] Adherence to this rule is particularly important in cases raising allegations of an unconstitutional taking of private property." (*Hodel* v. *Virginia Surface Mining & Recl. Assn.* (1981) 452 U.S. 264, 294-295 [69 L.Ed.2d 1,

27-28, 101 S.Ct. 2352].) ■ In addition, a statute or ordinance must be interpreted with reference to the whole system of law of which it is a part (*People v. Comingore* (1977) 20 Cal.3d 142, 147 [141 Cal.Rptr. 542, 570 P.2d 723]); if possible, significance and effect should be given to each section and part thereof. (*Zorro Inv. Co.* v. *Great Pacific Securities Corp.* (1977) 69 Cal. App.3d 907, 913 [138 Cal.Rptr. 410].)

■ As has been stated, the benchlands were zoned R-1-6-PD, which would permit construction of one-family dwellings, at a density of one site per 6,000 square feet. The County contends that Seascape could have been granted greater density on the benchlands had it applied for a Planned Unit Development (PUD) permit. A PUD allows the construction of buildings on a tract free of conventional zoning so as to permit a cluster of structures and some increased density on some portions of a tract, leaving the remainder as open space. (*Avco Community Developers, Inc.* v. *South Coast Regional Com.* (1976) 17 Cal.3d 785, 796 [132 Cal.Rptr. 386, 553 P.2d 546].) The County's zoning ordinances provided for PUDs, which could be located in *any* zoning district upon the granting of a use permit. (Santa Cruz County Code, § 13.04.305(b).) A PUD on a site of 10 acres or more, located in an R-1 district, could include *any use permitted in any residential or C-1* (neighborhood commercial) district either as a permitted or conditional use. (*Id.,* § 13.04.305(c).)

County Code section 13.04.306[5] sets forth density standards for a PUD site area.

The trial court apparently read subdivision b of that section to mean that the maximum density which would be allowed in a PUD in an R-1-6 district would be one single-family residential unit per 6,000 square feet, despite the fact that, according to section 13.04.305(c), a hotel or multiple family dwelling was a permitted use in a PUD of over 10 acres located in such a district. In effect, the court's reading nullifies section 13.04.305(c) as it applies to an R-1-6 district.

In brief, the County's position is that a PUD on the benchlands could include multiple dwelling units at a density of one dwelling unit per 1,000 square

---

[5]That section provides in relevant part: "b. Density. The average number of dwelling units per developable acre shall not exceed the maximum number of dwelling units prescribed by the site regulations or the site area per dwelling unit regulation for the district in which the planned unit development is located subject, however, to the exception that the average number of dwelling units per developable acre may exceed the maximum number of dwelling units prescribed for a district by not more than 10% in a planned unit development on a site of ten acres or more.

"c. Exception. The development standards and density requirements of subsections (a) and (b) above shall not apply in the 'U-BS' Districts wherein the standards and density must be consistent with the applicable General Plan as determined by the Planning Commission or Board, as the case may be. (Ord. 1714, Sec. 2, May 9, 1972)."

feet. (Santa Cruz County Code, §§ 13.04.305(c); 13.04.212-A, subd. 10; 13.04.195, subd. a; 13.04.051, subd. a, subsec. 8; 13.04.110-D.) In addition, the County argues that a hotel is a permitted use in a C-1 district. (§ 13.04.212-A, subd. 5.) A hotel is not a dwelling unit, and the density limitations in section 13.04.306 would not be applicable to preclude the award of compensating densities through approval of a hotel in a PUD on the benchlands.

The County's zoning ordinances are complex and ambiguous, and the relationship among the various sections is confusing, as is apparent from the conflicting testimony from various officials charged at various times with administration of these ordinances.[6] Nevertheless, the County's construction of the ordinances is preferable, as it would both give some effect and meaning to all the ordinances at issue, and avoid the possibility of a conclusion that ordinance 1800 is unconstitutional on its face. While the term "compensating density" does not appear as such in these ordinances, we conclude that in addition to granting compensating densities on the uplands, the County does have discretion to approve a PUD on the benchlands with varying uses and with a density greater than one single-family dwelling per 6,000 square feet. Accordingly, we cannot conclude that the mere enactment of ordinance 1800 constituted a taking.

"At this juncture, [Seascape is] free to pursue [its] reasonable investment expectations by submitting a development plan to local officials. Thus, it cannot be said that the impact of general land-use regulations has denied [it] the 'justice and fairness' guaranteed by the Fifth and Fourteenth Amendments. [Citation.]" (Fn. omitted.) (*Agins* v. *Tiburon, supra,* 447 U.S. 255, 262-263 [65 L.Ed.2d 106, 113-114].)

We must emphasize, however, that our conclusion rests on the premise that although development of the subject property is prohibited, the County's ordinances do permit the grant of compensating densities to Seascape on both its benchlands and uplands in excess of the basic densities which the zoning of those parcels would permit absent any consideration of the subject property. To ensure the County's compliance with our decision, we will direct the trial court to modify its order dismissing Seascape's second cause of action by adding that the cause is dismissed on condition that the County does grant Seascape such compensating densities. Should any dispute arise after Seascape submits its

---

[6]The trial court found that during the discussion prior to adopting ordinance 1800, the planning director informed the board of supervisors that no credit could be given for the arroyos and the beach if Seascape submitted a PUD for the benchlands. As the County points out, that conversation was ambiguous; the questioner asked about a PUD; the answer refers to a "PD," which is not the same as a PUD in Santa Cruz County. Moreover, while deference is generally accorded to the interpretation of ordinances by those whose task it is to administer them, in this case there was no unanimity among administrators as to the meaning of these ordinances.

development plan or plans for these parcels, the burden will be on the County to show that it has made provision either for the award of reasonable compensating densities or for some other transfer of development rights to Seascape in exchange for the prohibition against building on the subject property. (See *American Sav. & Loan Ass'n, supra,* 653 F.2d at p. 372.)

*The County's Cross-complaint*

I

In its cross-complaint, the County alleged that Seascape Beach and its access ways had been impliedly dedicated to the public. The court found that prior to the development of Seascape's property, the beach was remote and secluded, with limited access, and public use was casual rather than substantial. As Seascape developed its property, it extended streets, which facilitated beach access. Public beach use gradually increased, and at some point between 1970 and 1973 public use became substantial rather than casual, but there was no substantial public use for any five-year period prior to July 31, 1972.

In that month, the public was granted permission to use the beach for recreational purposes pursuant to Civil Code section 813.[7]

The court concluded that there had been no dedication of any of Seascape's property to the public, except for certain recorded dedications and grants of easements. The court also concluded that Seascape is the owner in fee simple absolute of the real property described in the cross-complaint, and that the seaward boundary of that property is the "mean high tide line." (Civ. Code, § 830.)

The County contends the trial court's findings with respect to public use of the beach are unsupported by the evidence. The County also contends that even if there has been no implied dedication, the seaward boundary of Seascape's fee is that point reached by the highest annual swells of the sea, and not by the mean high tide line.

"Adverse" use of shoreline property by the public for more than five years can result in an implied common law dedication of a public easement for recreational purposes in such property. (*Gion v. City of Santa Cruz* [consolidated with *Dietz v. King*] (1970) 2 Cal.3d 29, 38-39 [84 Cal.Rptr. 162, 465

---

[7]As amended in 1971, section 813 provides that a holder of record title may record a description of land and a notice that the right of the public to use the land is by permission and subject to control of the owner. The recorded notice is conclusive evidence in a judicial proceeding on the issue of dedication that public use is permissive and with consent. (Stats. 1971, ch. 941, § 1, p. 1845; see also Civ. Code, § 1009; 3 Witkin, Summary of Cal. Law (8th ed. 1973) Real Property, §§ 81 and 369, pp. 1836 and 2064.)

P.2d 50] (hereafter *Gion-Dietz*); *County of Los Angeles* v. *Berk* (1980) 26 Cal.3d 201, 209 [161 Cal.Rptr. 742, 605 P.2d 381].) "The question then is whether the public has used the land 'for a period of more than five years with full knowledge of the owner, without asking or receiving permission to do so and without objection being made by anyone.' [Citations.] . . . [T]he question is whether the public has engaged in 'long-continued adverse use' of the land sufficient to raise the 'conclusive and undisputable presumption of knowledge and acquiescence, while at the same time it negatives the idea of a mere license.' [Citations.]" (*Gion-Dietz, supra,* at p. 38.)

■ Litigants seeking to establish such adverse use must show that persons have used the property as they would have used public land, or as if they believed the public had a right to such use. (*Gion-Dietz, supra,* 2 Cal.3d at p. 39; *County of Los Angeles* v. *Berk, supra,* 26 Cal.3d at pp. 213-214.) That belief, as manifested by the public's actions with respect to the property, must be reasonable in light of all the circumstances. (*Berk, supra,* at p. 216.) Litigants must also show that various groups of persons rather than a limited and definable number used the land (*Gion-Dietz, supra,* at p. 39), and that public use has been "substantial." (*Berk, supra,* at p. 218; *County of Orange* v. *Chandler-Sherman Corp.* (1976) 54 Cal.App.3d 561, 565 [126 Cal.Rptr. 765].) Evidence that users looked to a governmental agency for maintenance of the land is significant in establishing an implied dedication to the public. (*Gion-Dietz, supra,* at p. 39.)

■ For a fee owner to negate a finding of intent to dedicate based on uninterrupted public use for more than five years, he or she must either affirmatively prove the grant of a license to use the property, or demonstrate a bona fide effort to attempt to prevent public use. While an owner's efforts may have been so minimal as to be inadequate as a matter of law, ordinarily the question is one of fact. (*Gion-Dietz, supra,* 2 Cal.3d at p. 41; *County of Los Angeles* v. *Berk, supra,* 26 Cal.3d at p. 216.)

■ The evidence with respect to the extent of the public's use of the beach prior to 1972 is in conflict, and it is elementary that this court is without power to reweigh the evidence and reach a factual determination contrary to that of the trial court. All factual matters must be viewed most favorably to the prevailing party and in support of the judgment. " ' "In brief, the appellate court ordinarily *looks only at the evidence supporting the successful party, and disregards the contrary showing.* " ' [Citation.]" (*Campbell* v. *Southern Pacific Co.* (1978) 22 Cal.3d 51, 60 [148 Cal.Rptr. 596, 583 P.2d 121], original italics.)

Viewed in that light, the evidence supports the trial court's findings. Prior to its purchase by Seascape, the area was part of a fenced horse and cattle ranch. In the middle of the ranch was a path to the beach, blocked by two wooden

gates, which were kept closed. Ranch owner Krag only occasionally saw people walking along the beach at water's edge, fishing and clamming; not many people got onto the beach.

Seascape acquired the property in 1963. At the time the property above the beach was being used for farming, and the beach was generally desolate. Seascape developed the property north of Seascape Beach into a residential subdivision, and advertised it as including a private beach. As Seascape commenced street improvements, its employees noticed an increase in people on the beach. Seascape hired people, including off-duty sheriff's deputies, to patrol the property and eject trespassers. On some occasions Seascape had vehicles towed away which were parked on the roads which led toward the beach. Eventually the corporation hired a fulltime security man who patrolled the beach in uniform, in a jeep, and was instructed to eliminate trespassers. At the time, Seascape permitted individuals from Rio del Mar tract to use the beach. On occasion Seascape gave specific permission to a group, such as a Boy Scout group, to use the beach. Seascape also gave sales promotional activities, and gave out passes for weekend use or day use. There was no evidence of any governmental maintenance of the area.

That evidence is sufficient to support the trial court's findings that prior to 1972, public use of the beach was not sufficiently substantial for any five-year period to negate the idea of mere license.

The County contends the public's use of the property is comparable to that of the public on the *Dietz* property in *Gion-Dietz,* apparently contending that the public's use is sufficient as a matter of law. The County's recitation of the facts in support of that contention, however, ignores the rule that this court must view those facts in the light most favorable to Seascape. In *Dietz,* the public in substantial numbers had used the beach and a road to the beach for over 100 years, to camp, picnic, collect driftwood, fish, and decorate graves at a small cemetery plot on the beach. Groups of Indians camped on the beach for weeks during the summer. The beach had also been used for commercial fishing, and there was no evidence that the respective fee owners had ever attempted to prevent this use. The evidence in this case, viewed in the light most favorable to the judgment, establishes no similar substantial use.

## II

█ Civil Code section 830 provides in relevant part: "Except where the grant under which the land is held indicates a different intent, the owner of the upland, when it borders on tidewater, takes to ordinary high-water mark; . . ." █ The high water mark refers to an average height of the high waters at a particular place over a long period of time, ascertainable by

reference to monuments and tidal data of the United States Coast and Geodetic Survey. (*People* v. *Wm. Kent Estate Co.* (1966) 242 Cal.App.2d 156, 159 [51 Cal.Rptr. 215].)

 Among its findings on the cross-complaint, the court found that the subject property is "included within the boundaries of the Aptos and San Andreas Mexican Grants, as surveyed, confirmed, patented, and conveyed by the United States . . . to Seascape's predecessors in the title pursuant to the Private Land Claims Act of 1851 . . . ." The court concluded that pursuant to Civil Code section 830, the seaward boundary of the property is the "mean high tide line," and that the federal patent did not indicate a different intent.

The County disagrees, and argues as follows: (1) the boundary is that provided by the Mexican law which prevailed when the original land grants were made; (2) that law provided that grants of land bordering on the sea bestowed title only to the point reached by the sea in its "highest annual swells" (in other words, to the *highest* high water mark); (3) Seascape's fee, therefore, extends only to the foot of the bluffs, and not as far toward the bay as the mean high tide line.

To fulfill its obligations under the Treaty of Guadalupe Hidalgo, under which California became a part of the United States, Congress enacted the Act of March 3, 1851, to ascertain and settle land claims in California. The act required persons claiming right or title in lands from the Spanish or Mexican governments to present their claims to a commission for settlement. Following a decree of confirmation by the commission, the land was surveyed by the Surveyor General and a map of the survey prepared. Thereafter, on proof of confirmation and approved survey to the General Land Office, the federal government issued a patent to the claimant. The patent issued on confirmation of the land grant "was conclusive of both (a) the validity of the grant . . . and (b) the land's boundaries. *U.S.* v. *Coronado Beach Co.* (1921) 255 US 472. Thus, if a patent conveyed title to the ordinary high tide line, there was no basis for an assertion that, under Mexican law, grants carried only to the highest high tide line and that consequently a strip of land between that line and the patent line remained public domain subject to entry." (Bowman, 2 Ogden's Revised Cal. Real Property Law (Cont.Ed.Bar 1975) §§ 26.2-26.3, pp. 1238-1239; see also 3 Witkin, Summary of Cal. Law (8th ed. 1973) Real Property, § 3, p. 1774.)

The record includes the 1860 and 1877 federal patents confirming the two land grants, and the 1858 and 1860 field notes of the final surveys of each rancho. With respect to the Aptos Rancho, the notes state that the boundaries of the rancho are "well defined by the Bay of Monterey, the Shoquel Rancho, the Shoquel Augmentation Rancho, and the San Andres Rancho . . . ." The notes

also state: "Commenced at the junction of the Sanjon de Boregas with the sea at the corner No. 2, of the Shoquel Rancho . . . I marked this post A. No. 1, and *thence meander the sea coast.*" Similarly, the field notes of the final survey of the Rancho San Andres state in part: "To true corner at foot of bluff on beach of Monterey Bay Thence following the meanders of the shore of Monterey Bay at high water mark. . . ." Surveyor Thomas Williams testified for Seascape that the boundary along Monterey Bay indicated in the patents and the field notes was the mean high water line.

The County argues at length that Williams' testimony was not credible, and offers its own complicated interpretation of the old field notes, in its effort to establish that the boundary as confirmed by the patents was not the mean high tide line.

Despite the County's arguments, *United States* v. *Pacheco* (1864) 69 U.S. (2 Wall.) 587 [17 L.Ed. 865] and *Coburn* v. *San Mateo County* (C.C.N.D.Cal. 1896) 75 Fed. 520 are dispositive. *Pacheco* is an appeal from a decree confirming title to and the location of a Mexican grant to land on the east side of San Francisco Bay. The decree described the land as bounded "on the west by the bay." (*United States* v. *Pacheco, supra,* at p. 588 [17 L.Ed. at p. 865].) The Supreme Court held that according to either common law or Mexican civil law, when the bay was given as a boundary and when nothing in the decree suggested otherwise, that boundary was the line of the ordinary high water mark. (*Id.,* at p. 590 [17 L.Ed. at p. 866].)

In *Coburn,* owner's land, bounded on the west by the Pacific, was originally part of a Mexican grant, on which a federal patent was issued. The description of its boundaries in the grant and the patent stated that the land bordered "to the west on the sea." (*Coburn* v. *San Mateo County, supra,* 75 Fed. at p. 526.) However, meander lines on the plat of the rancho, surveyed by the United States surveyor, seemed to indicate that the western boundary of the land was on the bluff bordering on the sea, and not on the beach itself. Owner claimed the grant from the Mexican government included the tidelands. In an argument similar to that of the County in this case, respondent in *Coburn* relied on the meander lines and claimed that owner's grant did not even extend to the tidelands, but ended on the bluff.

The court disagreed with both parties. Relying on *United States* v. *Pacheco, supra,* 69 U.S. 587, it held that under common law or Mexican civil law, because the bay was given as the boundary in the grant, that boundary was the high water mark. As for the meander lines, "it is well settled that they do not limit the boundary of the grant. Their purpose is to ascertain the quantity of land to be charged for." (*Coburn, supra,* 75 Fed. at p. 530.) The high water mark, and not the meander line, was the boundary. (*Id.,* at p. 531; see also

*Stillwell* v. *Jackson* (1936) 5 Cal.2d 165, 169 [53 P.2d 752] [In the absence of any other declared purpose, a meander line of description, used as a means of measuring and correctly locating the shore line, represents the line of ordinary high tide].)

The trial court did not err when it concluded that the seaward boundary of Seascape's fee was the mean high tide line, and that the federal patent did not indicate a different intent.[8]

 The County also contends that even if the bayward boundary of Seascape's lands extends to the mean high water line, the beach up to the highest high water mark is burdened with a "public servitude" similar to the "public trust easement" which exists in California tidelands conveyed by patent to private individuals. (See *Marks* v. *Whitney* (1971) 6 Cal.3d 251, 257-261 [98 Cal.Rptr. 790, 491 P.2d 374].)

 "Tidelands" are lands between the lines of mean high tide and mean low tide, covered and uncovered successively by the tidal ebb and flow. (*Marks* v. *Whitney, supra,* 6 Cal.3d at pp. 257-258; *City of Berkeley* v. *Superior Court* (1980) 26 Cal.3d 515, 518-519, fn. 1.) When tidelands have been granted by the state to a private party, that party receives the title to the soil, subject to the public's right to use the property for purposes such as commerce, navigation, fishing, as well as for environmental and recreational purposes. (*City of Los Angeles* v. *Venice Peninsula Properties, supra,* 31 Cal.3d at p. 291; *City of Berkeley, supra,* 26 Cal.3d at p. 521; *Marks* v. *Whitney, supra,* 6 Cal.3d at p. 259.) In other words, such lands are subject to a public trust easement. (*Ibid.*) The County's theory in this case is: (1) under Mexican law, there was an analogous public servitude in lands between the *highest* high water line and the mean low tide; (2) the servitude was not extinguished by issuance of the federal patents; (3) even if Seascape took title to the mean high tide line, the strip of land between the highest tide line and the mean high tide line remains subject to an easement for public use.

In light of *City of Los Angeles* v. *Venice Peninsula Properties, supra,* 31 Cal.3d 288, we conclude that the trial court correctly concluded that Seascape's property was not subject to any servitude. In that case, the court held that the public trust doctrine applies to tidelands which were originally acquired by

---

[8] *City of Los Angeles* v. *Venice Peninsula Properties* (1982) 31 Cal.3d 288 [182 Cal.Rptr. 599, 644 P.2d 792], decided after briefing was completed in this case, is distinguishable. In that case, notwithstanding the rule that a federal patent conclusively determines the boundaries of a grant, the Supreme Court held that the trial court properly took evidence as to whether a lagoon was an arm of the sea (and therefore tidelands) in 1850, as there was an ambiguity and inconsistency between the terms of the patent and the opinion of the Land Office Commissioner who had approved the underlying survey. (*Id.,* at pp. 295-296.) In this case, however, there were no comparable inconsistencies; rather, the question was the meaning of the terms of the patents.

private persons from the Mexican government prior to the time California was ceded to the United States, and which were later patented to the owners by the federal government in accordance with the requirements of the Treaty of Guadalupe Hidalgo. (*Id.,* at p. 291.) While the case confirms the County's analysis of the effect of a federal patent, it does not support the County's interpretation of the extent of the public's rights in land adjacent to the sea under Mexican law. The court flatly stated, "The law of Mexico . . . declared that the public had a right to the use of the *tidelands* . . . ." (*Id.,* at p. 297, italics added.) As already explained, "tidelands" are lands between the lines of mean high tide and mean low tide. (*Marks* v. *Whitney, supra,* 6 Cal.3d at pp. 257-258.) Nothing in *City of Los Angeles* supports the notion that the public's rights under Mexican law extended *beyond* the tidelands to the highest high water line, as the County would have this court hold.

That portion of the judgment concluding Seascape's property has been taken without just compensation and awarding damages for the taking is reversed. The trial court is directed to modify that portion of the judgment dismissing Seascape's second cause of action for declaratory relief by conditioning that dismissal on the grant of compensating densities to Seascape; as modified, that portion of the judgment is affirmed. Judgment in favor of Seascape on the County's cross-complaint is affirmed. Each party to bear its own costs.

White, P. J., and Barry-Deal, J., concurred.

Petitions for a rehearing were denied January 21, 1983, and the petitions of all parties for a hearing by the Supreme Court were denied April 20, 1983. Richardson, J., Kaus, J., and Broussard, J., were of the opinion that the petitions should be granted.